**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| VALL B., | |
| Plaintiff, | |
| v. | Case No. 1:19-cv-07759 |
| KILOLO KIJAKAZI, ACTING COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION,[1] | Magistrate Judge McShain |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Vall B. brings this action under 42 U.S.C. § 405(g) for judicial review of the Social Security Administration's (SSA) decision denying his application for benefits. For the following reasons, the Court grants Plaintiff's Motion for Summary Judgment [14], denies the Commissioner's Motion for Summary Judgment [25], reverses the SSA's decision, and remands this case for further proceedings consistent with the findings laid out below.[2]

**Background**

Plaintiff applied for disability insurance benefits on October 31, 2017, alleging a disability onset date of April 1, 1978. [11-1] 31. The claim was denied initially and

---

[1] In accordance with Fed. R. Civ. P. 25(d), Acting Commissioner of Social Security Kilolo Kijakazi is substituted as the Defendant in this case in place of the former Commissioner of Social Security, Andrew M. Saul.

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. However, referenced page numbers in the administrative record [11-1] refer to the page number at bottom right of each page.

on reconsideration. [*Id.*] 115, 121. Plaintiff requested a hearing, which was held by an Administrative Law Judge ("ALJ") on May 7, 2019. [*Id.*] 61-100. In a decision dated June 20, 2019, the ALJ found that plaintiff was not disabled. [*Id.*] 31-39. The Appeals Council denied review on September 25, 2019, making the ALJ's decision the final agency decision. [*Id.*] 1-4. This Court has jurisdiction to review the SSA decision under 42 U.S.C. § 405(g).[3]

## Legal Standards

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the ALJ conducts a sequential five-step inquiry: (1) whether the claimant is unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any listed impairment; (4) whether the claimant can perform his past relevant work; and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a

---

[3] The parties consented to the exercise of jurisdiction by a United States magistrate judge. [8].

determination that a claimant is not disabled." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

The Court reviews the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019)). But the standard "is not entirely uncritical. Where the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Brett D. v. Saul*, No. 19 C 8352, 2021 WL 2660753, at *1 (N.D. Ill. June 29, 2021) (internal quotation marks and citation omitted); *see also Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) ("When an ALJ recommends that the agency deny benefits, it must first 'build an accurate and logical bridge from the evidence to the conclusion.'") (internal citation omitted).

## Discussion

Plaintiff filed for supplemental security income (SSI) on October 31, 2017, at the age of 57. [11-1] 108-109. Plaintiff, who was incarcerated for much of his life from 1978 to 2017, alleged disability stretching back to April 1, 1978, the date of his initial incarceration. [*Id.*]. Plaintiff sought disability benefits based on a number of health issues, including a right eye injury, chest pains, asthma, high blood pressure, and left and right knee injuries. [*Id.*] 101-102.

At step one of his written decision denying Plaintiff's disability claim, the ALJ found the Plaintiff had not engaged in substantial gainful activity since October 31, 2017, the SSI application date. [*Id.*] 33.[4] However, at step two, the ALJ found that Plaintiff did not have an impairment or combination of impairments that had significantly limited (or was expected to significantly limit) his ability to perform basic work-related activities for twelve consecutive months. [*Id.*]. The ALJ did find that the Plaintiff had a number of medically determinable impairments: hypertension, asthma, hypokalemia, ST inversion, periodontitis, benign prostatic hypertrophy, peripheral neuropathy, diabetes mellitus, prostate cancer, urinary frequency, post-traumatic stress disorder (PTSD), and depression. [*Id.*]. But, the ALJ also found that Plaintiff's statements regarding the "intensity, persistence and limiting effects" of these impairments were "not entirely consistent with the medical evidence and other evidence in the record," and that his impairments, considered individually and in combination, did not significantly limit his ability to perform basic work activities. [*Id.*] 34-35, 39. Accordingly, the ALJ found that Plaintiff was not disabled and stopped his analysis at step two. [*Id.*] 38-39.

Plaintiff argues the SSA's decision should be reversed and remanded because the ALJ erred in finding the Plaintiff did not have a severe impairment and failed to adequately explain his reasoning. Specifically, Plaintiff argues that (1) the ALJ erred

---

[4] The ALJ noted in the opinion that SSI benefits are not payable prior to the month after the application was filed, which is why he identified the application date as the starting point of the analysis, and not the alleged onset date of April 1978. [*Id.*] 31 (citing 20 C.F.R. § 416.335). However, the ALJ also stated that, consistent with the requirements of the regulations, he "considered the complete medical history." [*Id.*].

4

in finding that he did not have a severe mental impairment; (2) the ALJ failed to address Plaintiff's chronic pain syndrome; and (3) the ALJ failed to explain why Plaintiff's allegations about his symptoms were inconsistent with the record. [15] 5-13.

After careful review of the parties' briefing, the ALJ's opinion, and the administrative record, the Court agrees with Plaintiff that the ALJ failed to properly evaluate the evidence related to his mental impairments, and that the ALJ's finding at step two that Plaintiff's mental impairments were non-severe is not supported by substantial evidence. Consequently, the Court concludes that the Commissioner's decision must be remanded.[5]

### A. The ALJ Failed to Properly Evaluate the Medical Record Evidence and Explain his Determination that Plaintiff's Mental Impairments Were Non-severe.

A "severe impairment" is an impairment or combination of impairments that "significantly limit[s] [one's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a). "Basic work activities" include understanding, carrying out, and remembering simple instructions and responding appropriately to supervision and co-workers. *See* 20 C.F.R. §404.1522(b). Conversely, an impairment is not "severe" when evidence establishes "only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered." Social Security Ruling ("SSR") 85-28 (SSA 1985). If the ALJ

---

[5] Given the Court's ruling on this issue, the Court need not address all of the Plaintiff's other arguments for reversing the SSA's decision.

determines that a claimant does not have a severe impairment, or a severe combination of impairments, the analysis stops at step two; the claimant is not disabled. *See, e.g., Zims v. Chater*, No. 94 C 3775, 1995 WL 571824, at *5 (N.D. Ill. Sept. 22, 1995). The Seventh Circuit has explained that the step-two determination of whether an impairment is severe is a "'*de minimis* screening for groundless claims' intended to exclude slight abnormalities that only minimally impact a claimant's basic activities." *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016) (quoting *Thomas v. Colvin*, 826 F.3d 953, 960 (7th Cir. 2016)); *see also Meuser v. Colvin*, 838 F.3d 905, 910 (7th Cir. 2016) ("an assessment of the functional limitations caused by an impairment is more appropriate for Steps 4 and 5, not Step 2").

Here, in explaining his step-two determination that Plaintiff's mental impairments were not severe, the ALJ acknowledged that Plaintiff's treatment records indicated he "frequently complained of depression and anxiety in early 2018," but he found that the records also showed that Plaintiff's mental examinations "were consistently normal." [11-1] 36 (citing [11-1] 564, 568, 614, 628-703, 804, 809, 826). The ALJ also stated that Plaintiff "did not start taking psychiatric medications to treat his impairments until October 19, 2018," and pointed to a treatment record from February 8, 2019 stating that Plaintiff was "doing well and living with his girlfriend." [*Id.*] (citing [11-1] 650, 778).

The ALJ also specifically relied on the opinion of one of Plaintiff's treating providers, Nurse Janel Draxler, APN, in support of his finding that Plaintiff's mental impairments were not severe. [*Id.*] 36-37 (citing [11-1] 824-826). Nurse Draxler, who

had treated Plaintiff on at least seven occasions between October 2018 and April 2019, filled out a Mental Impairment Questionnaire form for Plaintiff. [*Id.*] 824-826. Nurse Draxler indicated on the form that Plaintiff had only mild limitations or no limitations in the four broad areas of mental functioning which are set out in the disability regulations for evaluating mental disorders, known as the "paragraph B" criteria. [*Id.*] 36-38 (citing [11-1] 826). Specifically, the ALJ noted that Nurse Draxler marked that Plaintiff had only mild limitations in maintaining concentration, persistence, and pace and understanding, remembering, or applying information, and no limitations in managing or adapting oneself and interacting with others. [*Id.*].[6] The ALJ further noted that Nurse Draxler opined that Plaintiff's mental impairments would "cause him to be absent from work less than one day per month." [*Id.*]. The ALJ found Nurse Draxler's opinion "persuasive," because it was "consistent with the [Plaintiff's] treatment records, which document generally normal mental status examinations." [*Id.*]. The ALJ ultimately concluded that, because Plaintiff's mental impairments caused "no more than 'mild' limitations in any of the functional areas, they are nonsevere." [*Id.*] 38.

---

[6] When initially discussing Nurse Draxler's opinion the ALJ incorrectly asserted that Nurse Draxler had marked mild limitations in interacting with others, and no limitations in understanding, remembering, or applying information. [*Id.*] 37. However, later in the opinion the ALJ separately discussed his own findings for each of the four paragraph B mental functional errors, and correctly noted that Nurse Draxler had found no limitations in interacting with others and mild limitations in understanding, remembering, or applying information. [*Id.*] 38. The ALJ ultimately concluded Plaintiff had the same limitations as opined by Nurse Draxler, *i.e.*, that he had only mild limitations in maintaining concentration, persistence, and pace and understanding, remembering, or applying information, and no limitations in managing or adapting oneself and interacting with others. In support of his finding, the ALJ primarily relied on Nurse Draxler's opinion, and his repeated observation that Plaintiff's "mental status examinations were generally normal," though he also pointed to Plaintiff's testimony about his daily activities for support. [*Id.*].

7

> 1. *The ALJ erred in finding Plaintiff's diagnosed major depression non-severe under Seventh Circuit precedent.*

Plaintiff first argues that his diagnosis of severe recurrent major depressive disorder, on its own, warrants classification as a severe impairment under Seventh Circuit precedent. [15] 5 (citing *O'Connor-Spinner v. Colvin*, 832 F. 3d 690, 697 (7th Cir. 2014)). In *O'Connor-Spinner*, the claimant was diagnosed with "major depression, recurrent severe." *O'Connor-Spinner*, 832 F. 3d at 693. The ALJ there acknowledged that the claimant had been diagnosed with depression, though he did not specify the precise diagnosis of "severe" and "recurrent," and ultimately found it was not a severe impairment largely based on the opinions of two state-agency psychologists who had not examined or treated the claimant. *Id.* 697. The Seventh Circuit reversed the ALJ's determination as not based on substantial evidence, explaining that the ALJ's ruling "strikes [the court] as nonsensical given that the diagnosis [of severe recurrent major depression], by definition, reflects a practitioner's assessment that the patient suffers from 'clinically significant distress or impairment in social, occupational, or other important areas of functioning.'" *Id.* (citing American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 679-80 (4th ed. Text Rev. 2000)).

Plaintiff here was diagnosed with severe major recurrent depression around October 2018, the same exact diagnosis as the claimant in *O'Connor-Spinner*. *See* [11-1] 778-782, 789.[7] The ALJ did not mention that diagnosis in late 2018 at all, but

---

[7] The precise timeline of Plaintiff's diagnosis is somewhat unclear from the parties' briefing and medical records. Plaintiff points to a record from February 2019 listing "Depression-Major-Recurrent-Severe" as one of his diagnosed medical issues, he but does not

instead simply dismissingly referred to Plaintiff's "complaints" of depression and anxiety in early 2018, and untimely concluded that all of Plaintiff's mental impairments were not severe. [11-1] 36. Based on the Seventh Circuit's holding in *O'Connor-Spinner*, however, the Court finds that the ALJ erred in concluding that Plaintiff's severe major depression was not a severe impairment. Like the Seventh Circuit, the Court here finds it "nonsensical" that the ALJ could determine that Plaintiff's major severe recurrent depressive disorder is non-severe, when the diagnosis itself reflects, by definition, an assessment by Plaintiff's treating providers that he suffers from "clinically significant distress or impairment in social, occupational, or other important areas of functioning." *See O'Connor-Spinner*, 832 F. 3d at 697 (citation omitted). Indeed, courts in this Circuit have regularly relied on the reasoning of *O'Connor-Spinner* in finding that an ALJ erred in concluding at step two that a claimant's diagnosed severe depression was not severe. *See, e.g., Joseph S. v. Kijakazi*, No. 20-CV-3866, 2022 WL 1185207, at *2-3 (N.D. Ill. Apr. 21, 2022) ("it too strikes the Court here as 'nonsensical' that a diagnosis of severe depression/major depressive disorder could be classified by the ALJ as a nonsevere impairment"); *Tharp v. Saul*, No. 318CV00878WCLSLC, 2020 WL 806621, at *4-5 (N.D. Ind. Jan. 29, 2020) ("In light of this Seventh Circuit precedent, the ALJ likely erred in finding Tharp's major depression was non-severe at step two."), *report and recommendation*

---

specify when that diagnosis was first made. [15] 2 (citing [11-1] 615). On closer review of the records, it appears Plaintiff's treating providers first "recommended" a diagnosis of major depression at a mental health assessment in August 2018, and subsequently diagnosed him with major recurrent depressive disorder at a psychological assessment in October 2018. [11-1] 778-782, 789.

adopted by *Debra T. v. Saul*, No. 3:18CV878, 2020 WL 813092 (N.D. Ind. Feb. 18, 2020); *see also Eller v. Comm'r of Soc. Sec.*, No. 1:17-CV-00152-SLC, 2018 WL 3424619, at *5 (N.D. Ind. July 16, 2018); *Delph v. Berryhill*, No. 116CV02461TWPDML, 2018 WL 816856, at *4 (S.D. Ind. Jan. 23, 2018), *report and recommendation adopted*, No. 116CV02461TWPDML, 2018 WL 813639 (S.D. Ind. Feb. 9, 2018).

The Commissioner argues in response that Plaintiff's suggestion that his diagnosis "automatically" establishes a severe impairment "contravenes the well-established rule that a diagnosis cannot prove functional limitation." [26] 12-13; (citations omitted). The Court acknowledges that the Seventh Circuit's holding in *O'Connor-Spinner* that a diagnosis of severe major depression alone establishes a severe impairment is somewhat contradicted by other Seventh Circuit precedent holding that a diagnosis alone cannot establish functional limitations. *See generally Jamie Y. v. Saul*, No. 119CV03040TWPTAB, 2020 WL 4004062, at *8 (S.D. Ind. July 15, 2020) (noting that "the [*O'Connor*-Spinner] approach that a diagnosis alone establishes the degree of functional impairment does appear to be in tension with other Seventh Circuit precedent") (citing *Schmidt v. Barnhart*, 395 F.3d 737, 745-46 (7th Cir. 2005) (noting that a claimant pointing to a diagnosis is not sufficient to establish functional limitations); *see also See Shannon M. v. Saul*, 18 C 7074, 2020 WL 264522, at *5–6 (N.D. Ill. Jan. 17, 2020) ("Diagnosis does not equal disability. . . What matters is the severity of the condition and how it limits plaintiff's capacity to work, based on clinical and/or laboratory findings.") (citing *Schmidt*, 395 F.3d at 746).

10

The Seventh Circuit recognized this apparent tension in a case subsequent to *O'Connor-Spinner*, where the claimant argued that his diagnosis of schizophrenia on its own qualified as a severe impairment. *See Meuser*, 838 F.3d at 910. The court, citing to *O'Connor-Spinner,* noted it had "difficulty imagining" how a diagnosis of schizophrenia could not qualify as severe, but ultimately declined to resolve whether the diagnosis alone was sufficient, finding there were other specific issues with the ALJ's opinion warranting remand. *Id.* ("We need not resolve this issue, however, because the ALJ made other errors that alone warrant a conclusion that the ALJ's decision is not supported by substantial evidence.").

However, while the Seventh Circuit declined to resolve the question in *Meuser*, the court did not call into question the holding of *O'Connor-Spinner* either*,* and *O'Connor-Spinner* has not been expressly overruled or negatively cited by any subsequent Seventh Circuit opinions, nor have any of the above-cited district court cases been reversed. Therefore, while it may generally be the case that "diagnosis does not equal disability," under *O'Connor-Spinner* and its progeny the specific diagnosis of major severe recurrent depression at least does appear sufficient on its own to establish severe functional limitations. The ALJ thus erred in concluding the opposite. *See O'Connor-Spinner*, 832 F.3d 690 (noting that the court had not found "a published opinion from any circuit" in which a court affirmed an ALJ's determination that major depression was not a severe impairment).

Furthermore, regardless of whether this error would warrant remand on its own, the Court also agrees with Plaintiff that the ALJ committed other errors in that

he failed to properly evaluate the evidence related to Plaintiff's mental impairments and erred in assessing the opinion of Nurse Draxler.

### 2. The ALJ ignored contrary evidence and failed to explain his reasoning.

Regarding the ALJ's handling of the record evidence, Plaintiff argues the ALJ failed to properly evaluate contrary evidence and explain his reasoning. [15] 6-7. Plaintiff points not only to the evidence of his diagnosis and treatment for severe depression, but to the evidence that he complained of issues with memory impairment, psychosis, and post-traumatic stress disorder. [15] 5-6. Plaintiff points to treatment records from April 2018, August 2018, February 2019, and March 2019 which indicate that he had a PHQ-2 score of six out of six, indicating depression; and a GAD-2 score of six out of six, indicating anxiety. [*Id*] 6 (citing [11-1] 473, 633, 639, 671, 709). Plaintiff further notes he was stabbed and tortured while incarcerated, and reported hearing voices for years. [*Id.*] (citing [11-1] 778-780). Plaintiff also cites to his October 18, 2018 psychiatric evaluation, which indicated that he was suffering from a host of psychiatric symptoms, including sleep disturbance, panic attacks, poor concentration, depressed mood, crying spells, feelings of hopelessness and helplessness, and increased irritability and distractibility. [*Id.*] 6-7 (citing [11-1] 781). Plaintiff further notes he was prescribed four prescription medications to treat his psychiatric conditions. [*Id.*] 11. Plaintiff contrasts this evidence, which he contends demonstrates his severe mental impairments, with the only specific note discussed by the ALJ, an examination note from February 2019 which the ALJ stated showed Plaintiff was "doing well and living with his girlfriend." [*Id.*] 7. Plaintiff faults the

ALJ for only pointing to one specific treatment note and not discussing the other specific evidence related to his impairments, and thus argues that the ALJ failed "to provide a discussion explaining why a single good day was sufficiently probative to find that none of [Plaintiff's] mental impairments were severe." [*Id.*].

The Court agrees with Plaintiff that the ALJ failed to properly address the medical record evidence related to his mental impairments and explain his reasoning. While an ALJ "need not address every piece of evidence," he may not "ignore a line of evidence that undermines the conclusions [he] made, and [he] must trace the path of [his] reasoning and connect the evidence to [his] findings and conclusions." *Delph*, 2018 WL 816856, at *2 (citing *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012)); *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) (ALJs "cannot ignore a line of evidence contrary to her conclusion") (citations omitted).

Here, the ALJ briefly acknowledged that Plaintiff "frequently complained of depression and anxiety in early 2018" and that Plaintiff started taking psychiatric medication in October 2018, but dismissed Plaintiff's mental impairments as non-severe in part because of his finding that Plaintiff's "mental status examinations were consistently normal." [11-1] 36. For support of this conclusory statement that Plaintiff's evaluations were "consistently normal," the ALJ cited to a group of exhibits containing five specific treatment notes between August 2018 and March 2019, Nurse Draxler's evaluation form from April 2019, and a large exhibit containing over 160 pages of medical records from between April 2018 and March 2019. [*Id.*] (citing [11-1] 564, 568, 614, 628-703, 804, 809, 826).

However, the ALJ did not provide any elaboration as to why or how he concluded that the specific records he cited to indicated "normal" evaluations, nor did he explain what specific records in the large group of over 160 medical pages supported his conclusion.[8] Further, the ALJ failed to address the contrary evidence cited by Plaintiff and explain why it did not compel a different conclusion. For example, the ALJ suggested that Plaintiff complained of depression and anxiety in "early 2018," but the ALJ did not acknowledge Plaintiff's PHQ-2 and GAD-2 scores, which consistently indicated depression and anxiety between April 2018 and March 2019. [11-1] 473, 633, 639, 671, 709. The ALJ failed to address these records—that consistently indicate depression—despite the fact that they appear in the 160-page exhibit cited by the ALJ as generally showing "consistently normal" evaluations. Further, though the ALJ mentioned in passing Plaintiff's statement that he heard voices, and acknowledged that Plaintiff began taking psychiatric medications in October 2018, the ALJ did not acknowledge Plaintiff's specific diagnosis of severe recurrent major depression around this time, nor the serious complaints of psychiatric symptoms Plaintiff reported to his provider at his October 19, 2018 evaluation, such as the fact that Plaintiff had been hearing voices for years and was

---

[8] For example, two of the records cited by the ALJ reflect visits by Plaintiff to his treating provider in March 2019. [11-1] 36 (citing [11-1] 804, 809). However, it is unclear why these records demonstrate "normal" mental evaluations, as neither record contains detailed evaluation notes and both appear to simply be check-ups to confirm that Plaintiff was taking his psychiatric medication. [*Id.*] 804, 809. Indeed, at one of the visits the provider appears to have *increased* Plaintiff's medication for his psychosis, which would suggest something abnormal was going on. [*Id.*] 804. It is thus not apparent how these records support the ALJ's conclusion that Plaintiff's evaluations were normal.

experiencing sleep disturbance, poor concentration, increased irritability and distractibility, and had low energy. [15] 6-7 (citing [11-1] 781).

It is true that some of the records specifically cited by the ALJ arguably show "normal" mental status evaluations or less severe issues than the records pointed to by Plaintiff. For example, the ALJ cited to two medical treatment records related to Plaintiff's prostate in August and November 2018, at which the medical provider, Daniel Moreira, M.D., also noted "normal" psychiatric findings, specifically that Plaintiff was "oriented" and had "[a]appropriate mood and affect." [11-1] 564, 568. However, Dr. Moreira is not a mental health practitioner and was not conducting a formal mental evaluation, but was treating Plaintiff's physical conditions, a point that the ALJ did not acknowledge when citing to the record. On the other hand, the one specific treatment record that the ALJ did discuss from February 2019 does appear to have been a visit specifically for a mental health status, and the record does indicate that Plaintiff believed his medication was working, and he noted that he was living with his significant other and "doing well." [*Id.*] 614.

But critically, as Plaintiff points out in his briefing, the ALJ failed to explain why any of these specific records compelled a finding that Plaintiff's mental impairments were not severe, when there are other records the ALJ did not discuss reflecting Plaintiff's condition was more limiting and persistent. Again, ALJs are not allowed to ignore entire lines of evidence that undermine their conclusions, and must trace the path of their reasoning and connect the evidence to their conclusions. *See generally Arnett,* 676 F.3d at 592. The ALJ failed to satisfy these requirements here.

Plaintiff has cited to record evidence showing he was consistently demonstrating depression and anxiety between April 2018 and March 2019, and was diagnosed with severe recurrent major depression and put on psychiatric medications in October 2018 to address his series psychiatric symptoms. Rather than discuss this contrary evidence and Plaintiff's diagnosis of severe depression, the ALJ dismissingly referred to Plaintiff's diagnosis as merely "complaints" of depression, misleadingly summarized in a single sentence over 160 pages of medical records as "normal," and cherry-picked one positive record from February 2019. The Court finds this was an error warranting remand. *See Thomas,* 745 F.3d at 806 ("An ALJ need not mention every piece of medical evidence in her opinion, but she cannot ignore a line of evidence contrary to her conclusion. "); *Delph*, 2018 WL 816856, at *4 ("the ALJ is forbidden at every step of the analysis from cherry-picking evidence supporting her finding while ignoring contradictory information") *see also Michael v. Saul*, No. 2:20CV238, 2021 WL 1811736, at *11 (N.D. Ind. May 6, 2021) ("the ALJ cannot merely summarize the evidence," but must build a "logical analytical bridge" to their conclusion"); *Pamela B. v. Saul*, No. 2:20CV340, 2021 WL 2411391, at *11 (N.D. Ind. June 14, 2021) ("A summary of evidence does not replace meaningful analysis of evidence.") (citations omitted).

The Commissioner argues in response that the ALJ adequately cited to ample medical evidence in support of his conclusion that Plaintiff's mental impairments were not severe. [26] 10-11. The Commissioner, like the ALJ, cites a variety of medical records, including the February 2019 evaluation, which the Commissioner contends

demonstrate Plaintiff's normal mental functioning. [*Id.*] 10. But the fact that the Commissioner spends several pages of her brief arguing in detail how the record supposedly demonstrates Plaintiff's normal mental function just further emphasizes the deficiency in the ALJ's opinion. The ALJ did not discuss or analyze the evidence in the manner the Commissioner has attempted, and regardless of whether the records generally cited by the ALJ and the Commissioner ultimately support a finding that Plaintiff's mental impairments are not severe at step two, which seems unlikely under *O'Connor-Spinner,* that does not excuse the ALJ from only discussing favorable evidence, and misleadingly summarizing large groups of records without analyzing and accounting for the contrary evidence.

As to the specific contrary evidence that Plaintiff argues the ALJ failed to address, such as his PHQ scores, the Commissioner argues that those scores do not support Plaintiff's claims that his depression caused significant functional limitations, because they consist "merely of two questions about the frequency of a patient's depressed mood and anhedonia; and [their] outcome depends entirely on the patient's subjective responses." [26] 12. But whether or not the PHQ scores are persuasive data points is something the ALJ should have addressed and explained, and the Commissioner's suggestion that the ALJ would have been justified in discounting the evidence amounts to an impermissible post-hoc rationalization that the Court should disregard. *See, e.g., Eddins v. Colvin*, 15 C 8372, 2016 WL 6803102, at *7 (N.D. Ill. Nov. 16, 2016) ("the Commissioner cannot now rely on a rationale that the ALJ did not rely upon in his opinion") (citing *Meuser*, 838 F.3d at 911). Further,

17

the Court notes that psychiatric evaluations are often based on subjective complaints. *See generally Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015) ("psychiatric assessments normally are based primarily on what the patient tells the psychiatrist"). Thus the fact that the PHQ-2 scores were "subjective" would not necessarily warrant discounting them, and at the very least does not excuse the ALJ from ignoring them completely.

In short, the Court finds that the ALJ failed to adequately address the evidence in the record, including contrary evidence, and trace the path of this reasoning as to why the evidence supported a conclusion that Plaintiff's mental impairments, including his diagnosed severe major recurrent depression, were not severe.

**B. The ALJ Erred in Evaluating the Opinion of Nurse Draxler.**

In addition to the ALJ's errors in addressing the record evidence, the Court also agrees with Plaintiff that the ALJ committed an error in his analysis of the opinion of Nurse Draxler. In general, "[a]n ALJ has an obligation to evaluate every medical opinion and explain the weight given to the opinion." *Georgios A. v. Kijakazi*, No. 20-cv-2729, 2022 WL 1004249, at *5 (N.D. Ill. Apr. 4, 2022) (internal quotation marks omitted). For claims filed after March 27, 2017, as Plaintiff's claim was, the ALJ is required to evaluate and assign weight to medical opinions using a number of factors listed in the regulations, including: (1) supportability; (2) consistency; (3) the relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) the providers specialization; and (5) any

other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1520c(c),

416.920c(c). The regulations state that consistency and supportability "are the most

important factors we consider when we determine how persuasive we find a medical

source's medical opinions or prior administrative medical findings to be," and,

"[t]herefore we will explain how we considered the supportability and consistency

factors for a medical source's medical opinions or prior administrative medical

findings in your determination or decision." *See Farzad K. v. Kijakazi*, No. 20-CV-

2594, 2021 WL 4775297, at *4 (N.D. Ill. Oct. 13, 2021) (quoting 20 C.F.R. §

404.1520c(b)(2)). The ALJ may consider the other factors beyond consistency and

supportability, but is not required to do so. *Id.*; *see also* 20 C.F.R. § 404.1520c(b)(2)

("We may, but are not required to, explain how we considered the [other] factors in

paragraphs (c)(3) through (c)(5) of this section."). While the ALJ generally need only

minimally articulate his reasoning for how he assessed a medical opinion, he must

still consider the regulatory factors and build a "logical bridge" from the evidence to

his conclusion. *See generally Evonne R. v. Kijakazi*, No. 20 CV 7652, 2022 WL 874650,

at *5 (N.D. Ill. Mar. 24, 2022) ("'[L]ogical bridge' remains the touchstone of judicial

review. So while a detailed analysis is not required, the ALJ must consider the

regulatory factors and explain why a medical opinion is not supported or is not

consistent with the record to give a reviewing court the bridge to connect the outcome

to the record.") (citations omitted).

Here, the ALJ failed to comply with the requirements of the regulations and

adequately explain how he considered the supportability and consistency of Nurse

Draxler's opinion in assigning it weight. The ALJ stated that he found the treating source opinion from Nurse Draxler "persuasive," but his explanation for why it was persuasive comes down to a single sentence of his opinion in which he found the opinion "consistent with the [Plaintiff's] treatment records, which document generally normal mental status examinations." [11-1] 37. This conclusory and boilerplate statement that the opinion was consistent with the record, presented without any specific additional analysis, is insufficient to satisfy the requirements of the regulations. *See, e.g. Patrice W. v. Kijakazi,* 20 C 02847, 2022 WL 2463557, at *3 (N.D. Ill. July 6, 2022) (finding that an ALJ's statement that two agency consultant's opinions were "consistent with the record as a whole," without more, was insufficient because "the ALJ provided a 'conclusion, not a reason (or reasons)' supporting his conclusion") (citation omitted); *Evonne R.*, 2022 WL 874650, at *5 (finding the ALJ's general statement that an opinion was "inconsistent with the physical examination evidence detailed above" was insufficient to comply with the regulations); *see also Schmidt v. Colvin*, 545 F. App'x 552, 557 (7th Cir. 2013) (rejecting similar language as "entirely unhelpful" boilerplate that "provides no indication of which portions of the record might actually be consistent" with the medical opinions).

Further, as the Court has already detailed above, the ALJ's general assertion about what the record shows is itself flawed, because the ALJ failed to adequately address evidence in the record contrary to his conclusion. The ALJ thus cannot be said to have assessed and explained how Nurse Draxler's opinion is consistent "with the evidence from other medical sources and nonmedical sources in the claim" as

required by the regulations, because the ALJ did not adequately address and account for all the evidence in the record. *See Farzad K.*, 2021 WL 4775297, at *4.

Additionally, the ALJ's opinion fails to address the supportability of Nurse Draxler's opinion. Other than generally referring to Nurse Draxler as a treating source and that her opinion was "consistent" with the record, the ALJ offers no discussion as to whether the opinion was supported. This is a particularly notable failure given that, as Plaintiff points out in his briefing, Nurse Draxler expressly recognized the limitations of her ability to provide an opinion on Plaintiff's functional limitations. *See* [11-1] 825-826. As noted above, Nurse Draxler completed a questionnaire form and marked certain boxes indicating that Plaintiff had only mild limitations in interacting with others and maintaining concentration, persistence, and pace, and no limitations in managing or adapting oneself or understanding, remembering, or applying information. [*Id.*] 826. She also marked a box indicating that Plaintiff's mental impairments would "cause him to be absent from work less than one day per month." [*Id.*] 825.

However, Nurse Draxler declined to fill out other significant portions of the form related to Plaintiff's functional limitations. For example, Nurse Draxler crossed out a portion of the form where she could indicate whether Plaintiff was mildly, moderately, or markedly limited in 17 different mental abilities needed for unskilled work, writing that she was "unable to assess," though she did include a comment that Plaintiff "is able to make and attend scheduled appointments." [*Id.*]. Nurse Draxler also indicated she was "unable to assess" how often during a workday Plaintiff's

symptoms would interfere with the attention and concentration needed to perform simple work. [*Id.*]. In the conclusion of the form, Nurse Draxler stated that "[i]n order to more accurately evaluate the impact of mental illness on [Plaintiff's] functional status, would recommend neropsych [sic] testing." [*Id.*] 826. In other words, though Nurse Draxler checked certain boxes related to Plaintiff's mental functioning, she also declined to mark significant portions of the form related to Plaintiff's mental functional limitations, indicating that she was unable to assess those limitations and further testing would be necessary.

The ALJ makes no mention of Nurse Draxler's statements on the form regarding her inability to fully assess Plaintiff's functional limitations, despite the fact that those statements would seem to have a direct bearing on the general supportability of her opinion. The ALJ thus failed again to comply with the requirements of the regulations and explain how he considered the supportability of the medical opinion that he found persuasive. *See* 20 C.F.R. § 404.1520c(b)(2). This was an additional error that supports remand. *See, e.g., Hoffman v. Colvin*, No. 13 CV 6916, 2015 WL 5576655, at *6 (N.D. Ill. Sept. 21, 2015) (finding an ALJ erred in giving great weight to a medical opinion, in part because the ALJ failed to consider the provider's own statement that "she did not have enough information to assess [the plaintiff]")

In response, the Commissioner fails to adequately explain why the ALJ's boilerplate statement that Nurse Draxler's opinion was "consistent with the record" was sufficient under the controlling regulations. Instead, the Commissioner simply

argues that it was "reasonable" for the ALJ to reach that conclusion because the opinion was consistent with "plaintiff's numerous normal mental status assessments." [26] 11. The Commissioner also faults the Plaintiff for failing to put forth other evidence or opinions demonstrating he had significant functional limitations. [*Id.*] 12-13. But the Commissioner's arguments fail to address the actual error: the issue is not whether on balance the record as a whole ultimately supports Nurse Draxler's opinion, but whether the ALJ explained *why* the opinion is consistent and supported by the record, and did so without ignoring evidence contrary to his conclusion. The ALJ did not do this, and his general statement that Nurse Draxler's opinion was consistent with the record is a "'conclusion, not a reason (or reasons)' supporting [a] conclusion, and is insufficient." *Patrice W.,* 2022 WL 2463557, at *3.

The Commissioner also suggests that the ALJ found it "particularly notable" that Nurse Draxler, who was Plaintiff's "own treating provider," offered the opinion that she did that while being fully aware of his diagnoses. [26] 11. But while the ALJ mentioned in passing that Nurse Draxler was one of Plaintiff's treating providers, as Plaintiff notes in his reply the ALJ never discussed the extent of Nurse Draxler's treating relationship, nor did he specifically cite the fact that she was a treater when discussing why he found her opinion persuasive. [27] 6. The Commissioner's argument thus amounts to a further improper post-hoc rationalization which the Court may disregard. *See Eddins*, 2016 WL 6803102, at *7. Further, even if the ALJ properly considered Nurse Draxler's treating relationship with Plaintiff, that would

23

not excuse his failure to properly explain the "most important" factors of consistency and supportability.

Regarding Nurse Draxler's statements about the limitations of her opinions, the Commissioner argues that her "forthrightness . . . lends credence to the opinions that she did formulate." [26] 11. But again, as Plaintiff argues, this amounts to further improper post-hoc rationalization that the Court may disregard, as the ALJ did not mention the limitations in Nurse Draxler's opinions, let alone suggest that those limitations lend further support to the other opinions she did offer. Indeed one could just as easily draw the opposite conclusion from Nurse Draxler's statements about the limits of her opinions, *i.e.*, the fact that Nurse Draxler indicated that she was unable to assess many of Plaintiff's mental functional abilities could reasonably lead one to question the supportability of the opinions she did offer. The Court takes no position as to which conclusion is more proper, but the fact that those statements could go either way in assessing the opinion further emphasizes why the ALJ should have addressed them.

The Court thus finds that the ALJ failed to properly evaluate Nurse Draxler's opinion in line with the applicable regulatory factors. While the Court acknowledges that ALJs generally need only "minimally articulate" their reasoning in assessing medical opinions, the Court holds that the ALJ failed to meet even this standard, because he failed to explain how he considered the consistency and supportability of the opinion, and thus failed to build a "logical bridge" from the evidence to his conclusion.

***

In sum, the Court reiterates that the step-two determination of whether an impairment is severe is meant to be a "'*de minimis* screening for groundless claims' intended to exclude slight abnormalities that only minimally impact a claimant's basic activities." *O'Connor-Spinner*, 832 F.3d at 697 (quoting *Thomas*, 826 F.3d at 960); *see also Meuser*, 838 F.3d at 910 ("an assessment of the functional limitations caused by an impairment is more appropriate for Steps 4 and 5, not Step 2"). Under this *de minimis* standard, and in light of the precedent from *O'Connor-Spinner* regarding a diagnosis of severe depression, it was incumbent on the ALJ to adequately explain his reasoning and build the requisite logical bridge from the evidence—including any contrary evidence—to his conclusion that Plaintiff's mental impairments were not severe. But in light of the deficiencies outlined above in how the ALJ addressed the medical record and opinion evidence, the Court concludes the ALJ failed to meet this requirement. As a result, meaningful appellate review is impossible. This error was not harmless, as the ALJ found Plaintiff had no severe impairments and stopped his analysis at step two. *Compare with Jamie Y.*, 2020 WL 4004062, at *8 (holding that the any error in the ALJ finding the plaintiff's major depression disorder non-severe was harmless, because the ALJ proceeded to consider the plaintiff's mental impairments in formulating her RFC in subsequent steps).

The Court therefore finds the ALJ's determination that Plaintiff has no severe mental impairments was not supported by substantial evidence, and the case must therefore be remanded.

## Conclusion

For the forgoing reasons, Plaintiff's Motion for Summary Judgment [14] is granted, and the Commissioner's Motion for Summary Judgment [25] is denied. The decision of the SSA is reversed, and, in accordance with 42 U.S.C. § 405(g), this case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

_____
**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: September 29, 2022**